IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SENQUE SHAWARBI JEFFERSON,

    Petitioner,               No. CIV S-05-0977 LKK DAD P

    vs.

SCOTT KERNAN, Warden,

    Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him in March of 2002 in the Sacramento County Superior Court on charges of three counts of battery on three correctional officers. He seeks relief on the grounds that: (1) the trial court violated his constitutional rights when it excluded evidence of his mental illness and the circumstances of his housing during the guilt phase of his trial, and failed to instruct the jury that it could consider such factors in connection with his defense of self-defense; (2) petitioner's sentence of 50 years-to-life in prison constitutes cruel and unusual punishment; and (3) the trial court violated his right to due process when it denied his motion to strike his prior convictions. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

1

# PROCEDURAL AND FACTUAL BACKGROUND[1]

By amended information, the People charged defendant with three counts of committing a battery on three correctional officers (Pen.Code, § 4501.5; all undesignated section references are to the Penal Code), and two counts of aggravated battery by gassing (e.g., putting bodily fluids) on two of the officers. (§ 4501.1.) The information also alleged defendant had been convicted of six prior serious felonies for purposes of the Three Strikes law. (§§ 667, 1170.12.)

Defendant pled not guilty and not guilty by reason of insanity. Trial was bifurcated on the issues of guilt, sanity, and commission of prior serious felonies.

In February 2002 at the guilt phase, the jury found defendant guilty of all three counts of battery against a correctional officer. It deadlocked on the gassing counts, and the court declared a mistrial on those charges.

At the sanity phase, the jury determined defendant was sane when he committed the three crimes for which he was convicted.

Finally, the jury found all six of the strike allegations to be true.

Defendant asked the court to dismiss the prior strikes, claiming a sentence under the Three Strikes law would constitute cruel and unusual punishment. The trial court denied the request.

The court sentenced defendant to state prison for two consecutive terms of 25 years to life on two of the battery counts and the prior strikes. It imposed a concurrent term of 25 years to life on the third battery count.

/////

/////

---

[1] The following summary is drawn from the decision in People v. Jefferson, 119 Cal. App. 4th 508, 511-516 (2004), filed as Exhibit A to the Answer. Parts II, III, and IV of the court's opinion were not certified for publication. (Id.) This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "Clear and convincing evidence " within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004). Petitioner has not attempted to overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

FACTS

A. Guilt phase

On March 10, 2000, defendant was incarcerated at New Folsom Prison in the psychiatric services unit. That morning, Correctional Officers Brent Avery and Larry Anderson escorted defendant from the exercise yard back to his cell. Defendant's hands were handcuffed behind his back. When the trio reached defendant's cell, Avery looked inside it, then motioned a control officer to open the cell door. Defendant took a short step ahead of the officers, leaned forward as if to pick something up off the floor, then kicked Avery behind him in the stomach with his right foot. Avery described the kick as a "mule kick." It knocked Avery back into a railing.

Defendant then turned to face Anderson and began kicking him. At least one kick hit Anderson's right leg. To defend Anderson, Avery struck defendant with his fist, once in the shoulder and once in the back of the head. Then Avery grabbed defendant from behind and pulled him to the floor, face up. Defendant continued struggling and kicking. He spat at Avery, hitting him in the face and eyes. He also spat at Anderson, hitting him in the face and eyes. Anderson pulled out his pepper spray and warned defendant to stop or else be sprayed. Defendant continued to struggle, but with less intensity. A third officer arrived, and the officers put restraints on defendant's legs and a "spit net" over his head. They then escorted him to a holding cage. Neither Avery nor Anderson knew of any motive for defendant's attack.

On July 3, 2000, Correctional Officer Michael Edward Thomas was assigned to an infirmary at New Folsom Prison where inmates experiencing a mental health crisis are housed. A committee of mental health professionals reviews each inmate's placement in the infirmary twice each week. Thomas was assigned to take inmates from their individual infirmary cells to a smaller holding cell pending the committee's evaluation of each inmate.

That afternoon, defendant was in the holding cell waiting to meet with the committee. His hands were cuffed behind his back. He waited for about 30 minutes, at times being very loud, angry and verbal, at other times being quiet. The committee ultimately decided it would not meet with defendant that day, and instructed Thomas and his partner, Correctional Officer Michael Duke, to return defendant to his cell in the infirmary.

Duke went to the holding cell door and ordered defendant to turn around so he could inspect the handcuffs. Defendant, at that time quiet, complied. Duke then opened the cell door, and defendant slowly backed out of the cell. Once out, defendant turned and kicked Thomas twice with karate-style kicks to Thomas's left thigh.

The first kick forced Thomas back into a wall; the second was a glancing blow. Duke grabbed defendant and forced him to the ground. Other staff arrived, placing leg restraints on defendant and injecting him with medicine. Thomas was not aware of any motive defendant may have had to attack him or Duke.

Defense

Defendant admitted he was incarcerated because he had been convicted in 1994 of first degree murder and a number of counts of robbery.

About the March 2000 incident, defendant testified Officers Avery and Anderson were whispering to each other as they walked behind him, which made him nervous. Avery was handling him a little more roughly than usual. As the officers placed him in his cell, defendant heard "voices" outside his head. The voices told him the officers would hurt or kill him when he was in his cell, so he kicked the officers to get them off him. Defendant did not recall spitting on either of the officers, and accused them of lying. He also accused Avery of choking him while he was on the ground, saying "some spit may have come out then."

Regarding the July 2000 incident, defendant stated the voices became loud while he waited in the holding cell, telling him not to leave the cell because the officers would hurt him. The officers were giving him "bad energy" by their movements and conversation. When the officers came to take him from the cell, he fell to the ground and kicked one of the officers with a "push-kick, like, like a lightly get-off-me."

Defendant stated he heard voices "everyday, all day." He started hearing them when he was housed at Pelican Bay. The voices were usually those of women he knew when he was out on the street. They told him such things as his food was poisoned or a family member had died. At the time of trial, he was on medication – involuntarily – that he felt lowered the voices. Although the voices were powerful, he was able to ignore them better.

Defendant believed on both occasions he had no choice but to do what he did. He felt he had to get the attention of a nearby sergeant so the officers would be supervised while taking him to his cell.

B. Sanity phase

Defendant's evidence

Defendant's case in the sanity phase consisted of testimony by himself; Dr. Louis Flohrs, a staff psychiatrist at New Folsom's psychiatry services unit, and Dr. Russell Ewing, a staff psychiatrist at New Folsom's "ag seg unit."

4

Defendant testified he had resided at New Folsom for about two years and had been treated for mental illness while there. He was first treated for mental disabilities while an inmate at Pelican Bay in 1996. He heard voices every day, sometimes all day long. The voices began in 1995. He also on occasion saw hallucinations of evil faces inside walls.

Defendant repeated much of his testimony from the guilt phase concerning the facts of the charged offenses and the role the voices played in each. At the time of the first incident in March 2000, he had stopped taking medication prescribed for him because it made him sleep too much. At the time of the second incident in July 2000, defendant had refused to take his prescribed medication because the voices were telling him it was poison. He also had not slept for several days.

Defendant stated he thought of committing suicide every day. However, he acknowledged telling doctors he was suicidal even when he was not in order to be moved to the infirmary. He admitted he wanted to go to a state medical facility.

Dr. Flohrs testified he saw defendant in March 2000, when defendant asked Dr. Flohrs to increase his dosage of the drug Quetiapine. He declined the request. Under cross-examination, Flohrs confirmed he first saw defendant in November 1999, and concluded he had no major mental illness. At the March 2000 visit, Flohrs similarly concluded defendant was "Non-psychotic" and in a "stable mood." He was able to distinguish between right and wrong and knew and understood the nature and quality of his actions. Flohrs reached the same conclusion in August 2000.

In September 2000, defendant threatened to commit suicide and said the threat would get him admitted into the infirmary. In October, defendant escalated his threats and was admitted to the infirmary. He claimed the voices were telling him to hang himself. Flohrs, however, still saw no signs of mental illness, and questioned the veracity of defendant's claims.

Dr. Ewing had treated defendant for two years prior to trial. He diagnosed defendant as afflicted with schizophrenia, mixed type. His symptoms included angry paranoia towards New Folsom's staff, grandiose thoughts, auditory hallucinations, and claims there were worms in him. The symptoms waxed and waned. Ewing prescribed medications including Quetiapine, Lithium and Cogentin. Defendant rarely cooperated and regularly refused to take his medication. He has been forced to take his medication since July 2001 pursuant to an order under <u>Keyhea v. Rushen</u> (1986) 178 Cal.App.3d 526, 223 Cal.Rptr. 746.

On cross-examination, Ewing clarified that during the period of February through October 2000, defendant on two occasions

displayed no evidence of mental illness, and at those times appeared able to distinguish right from wrong and to know and understand the nature and quality of his actions.

Prosecution's evidence

The prosecution's case consisted of testimony by Dr. Franklin Curren, a staff psychiatrist in New Folsom's infirmary; Dr. Lauren Frank, a court-appointed psychologist; Dr. Mark Hoffman, a psychologist employed as New Folsom's clinical case manager; and Dr. Shawn Johnston, also a court-appointed psychologist.

Dr. Curren testified defendant was admitted to New Folsom's infirmary in February 2000 for "expressing suicidal ideation." Once admitted, defendant was verbally uncooperative. However, defendant told Curren he was not suicidal but knew what to say to get into the infirmary. Curren opined defendant was not psychotic at the time, was able to distinguish right from wrong, and could understand the nature and quality of his actions.

Dr. Frank met with defendant in April 2001 to evaluate defendant's competency and in August 2001 to evaluate his sanity. Frank asked defendant to describe the voices he heard during the two incidents at issue to determine whether defendant was faking a psychological problem. Defendant said they were voices of "people that he knew in the past" and were "in his ear." In Frank's experience, schizophrenics typically described voices "as coming from inside their head and being of either famous people or strangers or groups of people." She thus doubted defendant's claims.

Frank diagnosed defendant as having bipolar disorder, causing severe swings of emotion, from which he had suffered "his entire adulthood." She saw no indication of schizophrenia, which does not usually occur with bipolar disorder. She opined defendant had the ability to make a plan of action at the time of the incidents, exhibited by his statements he attacked the officers to draw the attention of their superiors. He also could predict the consequences of his acts because he knew the prison's rules and knew what would happen if he broke them.

Defendant told Frank if he threatened suicide, he would be evaluated for mental health problems; then he could be declared incompetent; and then he could be transferred to a state hospital, which was his goal. Based on defendant's statements to her, Frank concluded defendant understood the nature and quality of his acts and could distinguish between right and wrong. In her opinion, defendant was not legally insane at the time of the charged acts.

Dr. Hoffman met with defendant on the day of the first charged incident. Defendant stated he was upset because the officers

interfered with an appointment he had that day with another doctor. According to Hoffman, defendant had "an awareness for what had happened" and related a "motive" for "why he was doing what he was doing." Hoffman saw no signs of schizophrenia or bipolar disorder. Hoffman warned defendant his behavior could result in a referral to the district attorney. Defendant responded he did not care about that because he could use the diagnosis of bipolar disorder "to mitigate any charges." Hoffman concluded defendant was legally sane that day.

Hoffman also saw defendant on October 10, 2000, and again concluded defendant had no major mental disorder. At that time, defendant threatened suicide unless he was transferred to a state mental hospital.

Dr. Johnston interviewed defendant in June 2001, and also reviewed the incident reports. Defendant engaged Johnston in a rational and goal-oriented conversation. He did nothing "suggestive of a mental illness or a thought disorder or a psychosis." Johnston saw no overt signs of schizophrenia. He diagnosed defendant as having an antisocial personality disorder that could include schizophrenia in control or under remission. Johnston opined defendant was aware of the nature and quality of his acts when he did them and also understood they were wrong.

Defendant's rebuttal

Defendant testified his statement to Hoffman about officers interfering with a medical appointment did not refer to the two victims of the first incident. He stated he did not speak with Hoffman on the day of the incident, and accused Hoffman of lying when he dated his report March 10, 2000.

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas

/////

corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. Petitioner's Claims

    A. Exclusion of Evidence Concerning Petitioner's Mental Illness and Housing

        Petitioner claims that the trial court violated his rights to present a defense, to trial by jury, to compulsory process, to representation of counsel, and to due process when, during the guilt phase of his trial, it excluded evidence of his mental illness and the circumstances of his housing, and failed to instruct the jury that it could consider such factors in determining his guilt. He states that "there was substantial psychiatric evidence favorable to petitioner's defense which was excluded." (Points and Authorities in support of Amended Petition (hereinafter P&A), at 11.) He also argues that "demonstrating the conditions of petitioner's placement in the psychiatric services unit was highly relevant to the jury's understanding of whether excessive force was used and whether petitioner's fear was objectively reasonable." (Traverse at 8.)

        1. State Law Decision

        In the published portion of its decision the California Court of Appeal rejected petitioner's arguments in this regard, reasoning as follows:

> Defendant argues the trial court erred in not admitting evidence of his mental illness during the trial's guilt phase for purposes of establishing the "reasonable person" standard in support of his defense of self-defense. He asserts the evidence was relevant to establish a "reasonable person" in this case was a person in defendant's condition, and the trial court's actions denied him his constitutional right to present a defense. We disagree.

/////

9

A. <u>Background facts</u>

Before trial, the prosecutor moved to exclude evidence of defendant's mental condition during the guilt phase. He claimed the evidence was not relevant to determining guilt of the charged general intent crimes.

Defense counsel argued granting the motion would deny defendant an opportunity to present his defense of self-defense. The evidence, she asserted, was relevant to applying the reasonable person standard, and in this case a reasonable person was one in a mental health prison ward being treated for mental illness. Defense counsel also claimed she had the right to cross-examine the correctional officers on how they were trained to handled mentally ill inmates because the standards of excessive force would be different when handling mentally ill inmates instead of normal inmates.

The trial court granted the prosecution's motion and denied the defendant's request, both on the grounds of relevance. However, during trial, the parties agreed defendant could testify of hearing voices and fearing the correctional officers because of those voices. The prosecutor acknowledged the evidence was relevant to showing defendant's subjective belief in imminent harm, but he continued arguing the evidence was not relevant to whether that belief was objectively reasonable. Defendant repeatedly testified he kicked the officers in both incidents only because the voices told him the officers were about to attack him.

With regard to jury instructions, defense counsel requested an instruction on self-defense by which the jury would determine the reasonableness of defendant's fear from the perspective of someone with defendant's mental illness who hears voices. The court denied the request.

During closing argument, defense counsel asserted the reasonable person standard required the jury to consider the circumstances in which the defendant acted. Under this standard, she stated, "You place a reasonable person in the infirmary by guards who are not acting right, and this person is now cycling, hears voices talking, and he's trying to fight the voices." The court sustained the prosecution's objection of improper argument regarding the law of self-defense, but defense counsel continued along the same theme. The court again sustained the prosecution's objection of improper argument.

On rebuttal, the prosecution argued: "[A] reasonable person in the same or similar circumstances would be a reasonable person in prison. Not a reasonable mentally ill person. Not a reasonable person who is hearing voices. In fact, you can't get further apart from a reasonable person. [¶] Reasonable person is not somebody

[who is] mentally ill.  A reasonable person is not somebody [who is] hearing voices."

The trial court instructed the jury on self-defense pursuant to CALJIC No. 5.30, stating in pertinent part:  "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him.  In doing so, that person may use all the force and means which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar circumstances to be necessary to prevent injury which appears imminent."

During its deliberations, the jury asked the court if it could consider defendant's mental state as one of the "circumstances" referenced in CALJIC No. 5.30.  After obtaining approval from both counsel, the court responded in writing:  "In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation.  You are to consider how a reasonable person in the defendant's position and with his knowledge would act."

B.  Analysis

For an assault to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .'"  (CALJIC No. 5.50.)  It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .'  (People v. McGee (1947) 31 Cal.2d 229, 238, 187 P.2d 706 [italics added].)  To do this, it must consider all the "''facts and circumstances . . . in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety.'"  (People v. Moore (1954) 43 Cal.2d 517, 528, 275 P.2d 485, italics in original.)  As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .'  (People v. Smith (1907) 151 Cal. 619, 628, 91 P. 511.)  [¶] . . . [¶]  ". . . Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found [himself]."  (People v. Humphrey (1996) 13 Cal.4th 1073, 1082-1083, 56 Cal.Rptr.2d 142, 921 P.2d 1.)

For purposes of applying this test, defendant argues a reasonable person in this instance is one who is confined in a prison's psychiatric services unit.  Evidence of the conditions of

confinement, he continues, including his mental illness and the staff's training, should be considered by the jury "to determine whether the defendant had reasonable grounds for an honest belief that he was in imminent danger." He asserts the trial court's actions in granting the prosecution's in limine motion, denying his request for a jury instruction, and responding to the jury's question in the manner it did violated this test and unconstitutionally prevented him from raising his defense of self-defense.

Defendant misstates the objective "reasonable person" test. The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger. The issue is whether a "reasonable person" in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm.

By definition, a reasonable person is not one who hears voices due to severe mental illness. In blunt fashion, our Supreme Court long ago defined a reasonable person as a "normal person." (Katz v. Helbing (1928) 205 Cal. 629, 638, 271 P. 1062.) The reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be. (See, e.g., Davidson Steamship Co. v. United States (1907) 205 U.S. 187, 193, 27 S.Ct. 480, 483, 51 L.Ed. 764, 767 ["there is an obligation on all persons to take the care which, under ordinary circumstances of the case, a reasonable and prudent man would take"]; Fouch v. Werner (1929) 99 Cal.App. 557, 565, 279 P. 183 [standard of care is "the standard of an ordinarily prudent man under normal circumstances"].)

The common law does not take account of a person's mental capacity when determining whether he has acted as the reasonable person would have acted. The law holds "the mentally deranged or insane defendant accountable for his negligence as if the person were a normal, prudent person." (Prosser & Keeton, Torts (5th ed.1984) § 32, p. 177.)

California criminal law reflects this principle by prohibiting the defendant from proving insanity in the same trial where guilt is established. The defendant is presumed sane in the guilt trial. He raises the defense of insanity by separate plea, and the issue is decided in a separate trial. (§ 1026.) Evidence of defendant's mental condition is not admissible to prove the absence of general intent. (People v. Gutierrez (1986) 180 Cal.App.3d 1076, 1082, 225 Cal.Rptr. 885.)

The principle is similarly continued in the law of self-defense. In People v. Humphrey, supra, 13 Cal.4th 1073, 56 Cal.Rptr.2d 142, 921 P.2d 1 (Humphrey), the Supreme Court determined expert testimony concerning battered women's syndrome was relevant and admissible under Evidence Code section 1107 to establish the

objective reasonableness of defendant's belief in the necessity to kill the victim. (Id. at pp. 1076-1077, 56 Cal.Rptr.2d 142, 921 P.2d 1.) Defendant erroneously claims Humphrey required the admission here of his mental condition as part of establishing the reasonable person standard. Nowhere did the Humphrey court state the expert evidence could be used to redefine the "reasonable person" standard as one who suffered from battered women's syndrome or, as defendant argues here, one who suffered from hearing voices.

To the contrary, the Supreme Court stated: "[W]e are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' Evidence Code section 1107 states 'a rule of evidence only' and makes 'no substantive change.' (Evid.Code, § 1107, subd. (d).) The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable person, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the jury, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable." (Humphrey, supra, 13 Cal.4th at p. 1087, 56 Cal.Rptr.2d 142, 921 P.2d 1, italics in original.)

Here, the guilt phase jury knew defendant was an inmate at New Folsom Prison's psychiatric services unit; he was incarcerated for committing a homicide and a number of robberies; he was being involuntarily medicated; he heard "powerful" female voices every day telling him the staff is poisoning his food and things about his family; before each incident, the voices told him the correctional officers were going to hurt him; and he believed he had no choice but to follow the voices and do what he did. The jury also knew the facts of the incidents, and knew it had no evidence of any attempt by, or intent of the officers to harm defendant.

The jury thus had before it all of the relevant facts and circumstances in which defendant found himself. The trial court correctly denied defense counsel's efforts to define the reasonable person as a mentally ill person hearing voices. Under the rule of Humphrey, the jury was to determine whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger of bodily injury under the known circumstances. The jury was so instructed, and defendant was not denied the opportunity to present his defense in the manner allowed by law.

Jefferson, 119 Cal. App. 4th at 516-520.

/////

13

2.  <u>Due Process/Right to Present a Defense</u>

Petitioner first argues that the trial court's ruling excluding evidence of his mental condition and the conditions of his confinement in a psychiatric unit violated his rights to due process and to present a defense.  (P&A at 11-19.)

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element of due process of law."  <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967).  <u>See also</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 687, 690 (1986); <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984); <u>Webb v. Texas</u>, 409 U.S. 95, 98 (1972); <u>Moses v. Payne</u>, 555 F.3d 742, 757 (9th Cir. 2009).  However, the constitutional right to present a defense is not absolute.  <u>Alcala v. Woodford</u>, 334 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the state interest is strong."  <u>Perry v. Rushen</u>, 713 F.2d 1447, 1450 (9th Cir. 1983).

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78 (9th Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."  <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998).  <u>See also</u> <u>Crane</u>, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); <u>Greene v. Lambert</u>, 288 F.3d 1081, 1090 (9th Cir. 2002).  Further, a criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996) (quoting <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988)).  "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision."  <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172 (9th Cir. 2005).

As described above, petitioner was tried in a "bifurcated trial," where the guilt and sanity phases were tried separately before the same jury. (Reporter's Transcript on Appeal (RT) at 73.) At the guilt phase, the trial court excluded the presentation of evidence of petitioner's mental condition, finding that it was irrelevant to the issues to be determined at that phase of the trial. Specifically, the trial court ruled as follows:

> THE COURT: . . . I find that the facts of this case would not warrant an exploration or presentation of evidence of the defendant's mental illness during the guilt phase of the trial, these being all general intent crimes, and in no other way the Court could view that information being relevant to the crimes charged.
>
> The whole point of the second phase is to determine his sanity, and at that time of course there would be a full exploration of the issue of mental illness, and the effect on the defendant at the time of the offense.
>
> The second issue I've taken under submission is whether or not the officers' training regarding special handling of mentally ill patients within the confines of the prison could be presented as relevant in this case.
>
> The offer was that there may be a potential self-defense issue if the officers had been handling or interacting with the defendant in a way that was not sensitive to his mental illness needs.
>
> I don't find that there has been, as I understand the facts of the case, that that exploration would be relevant. It seems to me the officers' actual conduct, what they actually physically did, how they touched or approached or what they said to the defendant is relevant to the interaction of what happened, but the extent of specific training to sensitize them to the needs of the mentally ill patient apparently was not discussed at the time of his interaction; therefore, I do not see the relevance of that evidence and will preclude the parties from exploring that area.

(Id. at 71-72.)

Later in the proceedings, the trial court admitted evidence in support of petitioner's defense of self-defense to the effect that petitioner was "hearing voices, and as a result of hearing voices his fear of the alleged victims of this offense." (Id. at 249-52.) The trial court advised petitioner that he was allowed to "respond to questions regarding your mental state at the time." (Id. at 252.) The prosecutor agreed with the trial court's ruling in this regard,

noting that "self-defense actually has two prongs: there is a subjective prong and an objective

reasonable person prong," and that evidence of petitioner's voices was relevant to the "subjective

prong." (Id. at 250.) The prosecutor disagreed, however, that "a reasonable person included a

mentally ill person." (Id.) Petitioner testified, as described above, that his assaults against the

correctional officers were caused by voices which were making him afraid of the officers. (Id. at

256-72.) He also testified that he was involuntarily medicated. (Id. at 260.)

The California Court of Appeal found that excluding additional evidence, beyond

that noted above, of petitioner's mental condition and conditions of confinement with respect to

the definition of "reasonable person" was proper under California law. The appellate court's

finding in that regard is binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005)

("We have repeatedly held that a state court's interpretation of state law, including one

announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

corpus"). This court may not second-guess the state court's conclusion that, under state law, a

"reasonable person" for purposes of the defense of self-defense "is not one who hears voices due

to severe mental illness." Jefferson, 119 Cal. App. 4th at 481. The question before this court, as

described above, is whether the trial court's exclusion of this evidence precluded petitioner from

presenting his defense and rendered his trial fundamentally unfair. If it did, this court must

determine whether the constitutional error had a "substantial and injurious effect or influence in

determining the [fact finder's] verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

Petitioner has failed to demonstrate either an error of constitutional magnitude or

that any error by the trial court had a substantial or injurious effect or influence on the verdict in

this case. Petitioner's defense was that he assaulted the correctional officers because voices in

his head caused him to be afraid of them and believe he had to defend himself against them. He

was allowed to testify before the jury at length about these motivations. As explained by the

California Court of Appeal, the jury was aware that petitioner was hearing voices, that the voices

16

caused him to be afraid of the correctional officers, and that he assaulted the officers in an attempt to get away from them. The jury also knew that petitioner was confined in a psychiatric unit and that he was involuntarily medicated. The jury was therefore apprised of all of the relevant circumstances in which petitioner found himself, and was able to determine whether petitioner's actions were reasonable from the point of view of a reasonable person in petitioner's position, considering all the facts and circumstances that operated on his mind at the time of the alleged crimes. That is all that is required under California law. See People v Humphrey, 13 Cal. 4th 1073, 1082-83 (1996).

While petitioner states there was other evidence that would have been relevant to his defense of self-defense, he has failed to describe that evidence in any detail, nor has he demonstrate how its admission would have been helpful to his defense. Petitioner's vague and unsupported statements that there was "substantial psychiatric evidence," (P&A at 11), "evidence of petitioner's mental illness," (id.), "evidence of the environment in which petitioner was confined," (id. at 14), and evidence regarding the "psychiatric services unit," (id.), that he may have wished to present in support of his defense are insufficient to establish error or prejudice. See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

Petitioner cites to the decisions in DePetris v. Kuykendall, 239 F.3d 1057, 1059 (9th Cir. 2001) and United States v. Austin, 933 F.2d 833 (10th Cir. 1991) in support of his argument that exclusion of evidence regarding his mental condition and the conditions of his confinement rendered his trial fundamentally unfair and prevented him from presenting a complete defense. However, these cases are distinguishable and do not support petitioner's claims.

In Kuykendall, the defendant shot and killed her husband while he was asleep in bed. 239 F.3d at 1058. The Ninth Circuit found a due process violation where the trial court

excluded journal entries of the deceased husband that supported the defendant's imperfect self defense theory. 239 F.3d at 1062-63. The journal contained the deceased's own handwritten description of his physical abuse of his homosexual companion, his beating of his stepdaughter, his rape of a friend's girlfriend, and numerous accounts of beating his first wife. Id. at 1060. The trial court ruled that the journal and all references to it were inadmissible. Id. at 1061. In finding a due process violation, the Ninth Circuit noted that "[n]one of the other evidence adduced at trial could in any way make up for [the defendant's] own testimony about her state of mind, or for [the deceased husband's handwritten corroboration of it.]"). Id. at 1059. In short, the defendant was "prevented from testifying fully about why she feared him so." Id. at 1063.

In contrast, in this case petitioner was permitted to testify fully and at length about the voices in his head telling him to be afraid of the correctional officers. The jury also knew about the conditions of petitioner's confinement; specifically, that he was housed in a psychiatric unit and was being involuntarily medicated. Unlike the situation in Kuykendall, petitioner was not asserting a defense of "imperfect" self-defense, nor was he prevented from presenting any evidence in support of his defense of self-defense. Cf. Gill v. Ayers, 342 F.3d 911, 922 (9th Cir. 2003) (due process was violated where the excluded testimony was the sole evidence related to defendant's only defense).[2]

In Austin, a criminal appeal decided prior to enactment of the AEDPA, the Tenth Circuit concluded that the district court had erred when it precluded the presentation of an insanity defense by virtue of its rejection on remoteness grounds the reports of several psychologists and psychiatrists who had examined the defendant. In that case the district court was presented with tangible evidence of brain damage and mental illness which was ultimately determined by the appellate courts to be of assistance to the jury in understanding the issues to be

---

[2]   The court also notes that the petitioner in Kuykendall wished to present specific evidence that could be evaluated by the court to determine whether it was relevant or merely cumulative. Here, petitioner has not described with particularity any relevant evidence that he wished to present which was excluded by the trial court.

resolved at trial. 933 F.2d at 837-38, n.1. To the contrary, in this case petitioner has failed to come forward with any specific information to show or suggest a reasonable likelihood that the result of his trial would have been different if the trial court had allowed the defense to present additional evidence on the subject of petitioner's mental condition or the conditions of his confinement.

Based on this court's review of the record under the deferential standards of the AEDPA, it cannot be said that the state courts' determination of petitioner's due process claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, petitioner is not entitled to relief on these claims.

### 3. Erroneous Jury Instruction

In a related claim, petitioner argues that the trial court violated his rights to present a defense, to trial by jury, to representation of counsel, and to due process when it responded to the jury's question regarding whether it could consider his mental state as one of the "circumstances" in determining how a reasonable person would act, as that term was defined in CALJIC No. 5.30. (P&A at 19-24.) Petitioner contends that the court's responsive instruction compounded the confusion resulting from the parties' closing arguments and misled the jury as to the circumstances they could properly consider in analyzing whether he acted in self-defense. Petitioner argues that "the jury should have been instructed to consider all the relevant circumstances in which the defendant was placed, which includes not only his circumstances of being in prison, but also his circumstances of being in a psychiatric unit." (Id. at 21.)

A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton, 768 F.2d at 1085-86 (citing Engle, 456 U.S. at 119); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). See also Mitchell v. Goldsmith, 878 F.2d 319, 324 (9th Cir. 1989) (in the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law). To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

19

conviction violates due process.'" <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp</u>, 414 U.S. at 147). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir. 1988) (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)). To obtain habeas relief following an allegedly erroneous response to a jury's request for clarification, a petitioner must show that (1) the response was an incorrect or inaccurate application of state law, (2) constitutional error resulted and (3) the error was not harmless. <u>Richter v. Hickman</u>, 521 F.3d 1222, 1237 (9th Cir. 2008); <u>Morris v. Woodford</u>, 273 F.3d 826, 833 (9th Cir. 2001). To determine whether the error was harmless, this court must consider whether the error had a "substantial and injurious effect or influence on the jury's verdict." <u>Calderon v. Coleman</u>, 525 U.S. 141, 147 (1998).

Petitioner has failed to show that the trial court's response to the jury's question was an incorrect or inaccurate application of state law. As explained by the California Court of Appeal, the "reasonable person" standard of self-defense means a person without a mental illness or other unique characteristics. <u>Jefferson</u>, 119 Cal. App. 4th at 480-81. This is precisely what the trial court told the jury in its responsive instruction. Indeed, that responsive instruction was approved by both the prosecutor and petitioner's trial counsel before it was provided to the jury. Contrary to petitioner's argument, the instruction did not misinstruct the jury "regarding the scope of circumstances the jury could take into account." (P&A at 21.)

The trial court's response also referred the jury back to CALJIC No. 5.30. (Clerk's Transcript on Appeal (CT) at 131, 134.) Petitioner concedes that CALJIC 5.30 is a correct statement of California law. (P&A at 20.) Under these circumstances, the trial court's clarifying instruction did not cause a violation of petitioner's rights under the federal

/////

/////

/////

constitution.  <u>Richter</u>, 521 F.3d at 1237; <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (no

constitutional violation where trial judge responded to the jury's question by directing its

attention to the paragraph of the constitutionally adequate instruction that answered its inquiry).[3]

Moreover, even if the trial court had committed constitutional error in this regard,

the error was harmless.  There is no evidence the court's responsive instruction was erroneous or

that the jury remained confused after receiving the instruction.  Further, for the reasons described

above, the instruction did not prevent the jury from hearing specific relevant evidence, nor did it

"[keep] the jury from finding petitioner acted in self-defense."  (P&A at 23.)[4]  The decision of the

California Court of Appeal that petitioner's jury was correctly instructed on his defense of self-

defense is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner

is not entitled to relief on these claims.

B.  <u>Cruel and Unusual Punishment</u>

Petitioner claims that his sentence of 50 years-to-life constitutes cruel and unusual

punishment, in violation of the Eighth Amendment.  (Pet. at 5.)  He argues that "a sentence of

fifty years to life for a crime committed by a mentally ill patient because he was mentally ill is

simply barbaric and makes no sense."  (P&A at 26.)

/////

---

[3]  Petitioner also appears to be claiming that the trial court improperly omitted a jury instruction that would have explained the law correctly to the jury.  (P&A at 22.)  Petitioner has not explained which jury instruction the court omitted, nor has he demonstrated that the instructions actually given violated state law.  Accordingly, any such claim should be rejected.  To the extent petitioner disagrees with California law  with regard to the definition of a "reasonable person," such a claim is not cognizable in this federal habeas corpus action.

[4]  Petitioner argues that harmless error analysis is not required in this instance because the trial court's instruction constituted structural error.  (P&A at 23.)  <u>See</u> <u>Conde v. Henry</u>, 198 F.3d 734, 741 (9th Cir. 2000) (harmless error review not applicable to defects affecting framework within which trial proceeds, rather than simply error in trial process itself).  This argument is unpersuasive and should be rejected.  For the reasons described above, petitioner was not prevented from presenting his defense to the jury by virtue of the court's instruction, nor was the jury prevented from determining whether the elements of the charges against petitioner had been proven beyond a reasonable doubt.  Accordingly, the trial court's error, if any, constituted a trial error which is subject to harmless error analysis.

In the unpublished portion of its opinion on petitioner's appeal, the California Court of Appeal rejected this argument, reasoning as follows:

> Defendant argues his sentence of 50 years to life under the Three Strikes law "is simply barbaric under the circumstances of this case and this defendant, even considering the notion of recidivism." He asserts the sentence is grossly disproportionate to the offenses in violation of the federal and state constitutional prohibitions against cruel and/or unusual punishment. We disagree.
>
> The Eighth Amendment to the federal constitution contains a "narrow proportionality principle" that "applies to noncapital sentences" by which a court determines whether a sentence constitutes cruel and unusual punishment. (Harmelin v. Michigan, (1991) 501 U.S. 957, 997 [115 L.Ed.2d 836, 866].) "'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (Ewing v. California (2003) 538 U.S. 11 [155 L.Ed.2d 108, 119], citations omitted.) To apply this principle, courts compare the gravity of the offense with the harshness of the penalty. (Id. at p. 28.) The gravity of the offense also takes account of the defendant's recidivism and the legislative policies supporting the Three Strikes law. (Id. at pp. 29-30.) A court is not mandated to compare the punishment within and between jurisdictions for purposes of the Eighth Amendment test. (Id. at pp. 23-24.)
>
> California applies a similar test for determining whether a punishment violates the California Constitution's ban on cruel or unusual punishment, but also compares the punishment with other punishments both in and outside California. A sentence violates the state ban if it "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (In re Lynch (1972) 8 Cal.3d 410, 424.) Courts use three guidelines to determine whether a punishment shocks the conscience and offends fundamental notions of human dignity. They are: (1) examining the nature of the offense and the offender (similar to the federal test), with particular regard to the degree of danger both present to society; and (2) comparing the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses; and (3) comparing the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision. (In re Lynch, supra, 8 Cal.3d at pp. 425-427.) Disproportionality need not be established in all three areas. (People v. Norman (2003) 109 Cal.App.4th 221, 230.)
>
> Defendant argues his sentence is constitutionally disproportionate under the first two of the three factors.

A.  <u>Gravity of offense/harshness of penalty on defendant</u>

Examining the nature of defendant and his offenses does not reveal a disproportionate sentence in relation to the crimes committed. The jury convicted defendant of three counts of battery upon a correctional officer.  The crime is a felony subject to a two, three, or four-year consecutive term of imprisonment.  (§ 4501.5.)

Defendant was also punished for his recidivism.  The jury determined defendant, who at sentencing was age 28, had been convicted previously of six strikes: one for first degree murder and five for robbery with firearm use.  His committing three more felonies demonstrated defendant remained a violent threat to society.

Defendant argues the sentence was unconscionable due to his mental illness.  However, most of the experts and the sanity phase jury determined defendant was legally sane at the time he committed the crimes.  Under these circumstances, we conclude the punishment is not grossly disproportionate to the defendant's individual culpability.

B.  <u>California punishments for different offenses</u>

On this prong, defendant argues his sentence is not in proportion to punishments California law imposes on other crimes.  Defendant's comparison to other crimes is flawed because his sentence of 50 years to life is for two felony convictions sentenced consecutively (with a third sentence stayed)  and is based on six prior felony convictions, while the length of imprisonment he cites for other crimes relates only to a conviction on one count.

Defendant also argues the punishment is disproportionate because the Three Strikes law punishes recidivists significantly more than other recidivism sentencing statutes.  That may be so, but there is now no doubt the mere fact of imposing a sentence under the Three Strikes law as opposed to older recidivism sentencing statutes does not violate constitutional protections against cruel and unusual punishment.  (<u>Ewing v. California</u>, <u>supra</u>, 155 L.Ed.2d at pp. 24-28.)

Based on the above, we conclude defendant's sentence of 50 years to life does not constitute cruel or unusual punishment in violation of federal and state constitutional law.

(Answer, Ex. A at 24-27.)

In  <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003), the United States Supreme Court found that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant

clearly established law amenable to the [AEDPA] framework is the gross disproportionality

principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare'

and 'extreme' case." 538 U.S. at 73 (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991);

Solem v. Helm, 463 U.S. 277, 290 (1983); and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).

The Supreme Court concluded that two consecutive twenty-five years to life sentences with the

possibility of parole, imposed in that case under California's Three Strikes Law following two

felony convictions for petty theft with a prior, did not amount to cruel and unusual punishment.

Andrade, 538 U.S. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a

sentence of twenty-five years to life imposed for felony grand theft under California's Three

Strikes law did not violate the Eighth Amendment).

Following the decision in Andrade the United States Court of Appeals for the

Ninth Circuit has held that a third strike sentence of twenty-five years to life in prison for a third

shoplifting offense, a "wobbler" under state law[5], constituted cruel and unusual punishment.

Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004). In so holding, the court relied upon the limited

and non-violent nature of the petitioner's prior criminal history and the fact that the petitioner's

only prior period of incarceration had been a single one-year jail sentence. Id. at 768-69.

Thereafter, in Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the Ninth Circuit distinguished the

holding in Ramirez from the situation it confronted, finding that the petitioner in Rios had a

"lengthy criminal history," had "been incarcerated several times," and that the prior strikes used

to enhance his sentence had "involved the threat of violence." Id. at 1086.

This court finds that the sentence imposed upon petitioner, while undeniably

harsh, does not fall within the type of "exceedingly rare" circumstance that would support a

finding that his sentence violates the Eighth Amendment. Petitioner was convicted of felony

battery against three correctional officers. In view of the decisions noted above, the court cannot

---

[5] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony
under applicable law. See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

conclude that petitioner's sentence is grossly disproportionate to those crimes. See Harmelin, 501 U.S. at 1004-05 (life imprisonment without possibility of parole for possession of 24 ounces of cocaine raises no inference of gross disproportionality). Moreover, petitioner has an extensive criminal record, which includes six prior felony convictions, including one conviction for murder. Under these circumstances, the state courts' rejection of petitioner's Eighth Amendment claim was neither contrary to, nor an unreasonable application of clearly established federal law.

Petitioner argues that a strict application of the Three Strikes Law to a mentally ill prisoner is unconstitutional as applied. (P&A at 24.) Petitioner has not cited any cases in support of this proposition, conceding that he has found "no discussion of the application of the Three Strikes Law to offenses committed by mentally ill prisoners." (Id.) In the absence of authority supporting petitioner's argument in this regard, the decision of the California Court of Appeal upholding petitioner's sentence cannot be said to be contrary to or an unreasonable application of federal law. See Knowles v. Mirzayance, ___ U.S. ___, 129 S.Ct. 1411, 1419 (2009); Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004) ("If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly– established federal law").

The sentence imposed in petitioner's was within statutory limits for the offense committed and was not grossly disproportionate to the crime of conviction in light of his criminal history. See Andrade, 538 U.S. at 77. Therefore, petitioner is not entitled to relief on his Eighth Amendment claim.

C. Failure to Strike Prior Convictions

Petitioner's final claim is that the trial court violated his right to substantive due process when it denied his motion to strike his prior convictions. (Pet. at 5; P&A at 27-28.) He argues that the trial court's decision was arbitrary and unfair. (Id.) In state court, petitioner argued that the trial court abused its discretion under state law in denying his motion to strike the priors. The California Court of Appeal rejected this argument, reasoning as follows:

Defendant next claims the trial court abused its discretion in denying his motion to strike prior strike convictions. He argues sentencing him on the prior strikes in light of his mental illness and incarceration in a psychiatric unit at the time of the offenses, as well as the non-serious nature of the current crimes, was unjust and outside the spirit and purpose of the Three Strikes law. We disagree.

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies. If . . . it is reviewing the striking or vacating of such allegation or finding, it must pass on the reasons so set forth." (People v. Williams (1998) 17 Cal.4th 148, 161.)

Here, the trial court had before it all of the evidence summarized above. It also had a probation report, which documented defendant's criminal history: a 1989 juvenile adjudication for battery, resulting in an out-of-home placement; a 1991 juvenile adjudication for escape, resulting in probation; a 1994 conviction for first degree murder, five counts of robbery with a firearm use, and one count of attempted robbery with firearm use, resulting in a prison term of 25 years to life plus 19 years 4 months,[6] and a 1997 conviction for battery by a prisoner and resisting an officer, resulting in a prison term concurrent to the one being served.

Defendant told the probation officer he had never been married, but he had fathered two children. He received no visits from his family. He completed the 11th grade. He worked as a dishwasher from 1986 through 1988 and a custodian in the summer of 1992. He denied any history of substance abuse. He claimed a "non-specific mental defect." He was housed in a state mental hospital as incompetent to stand trial from May to November 1993, before being declared competent.

Prison records from just 2001 showed numerous disciplinary proceedings against defendant for various rule violations, including incidents of assault. The probation officer found two aggravating

---

[6] The probation report states defendant, in a three-month period in 1992, successfully robbed five persons at gunpoint in San Francisco of their cars, wallets and keys. In a sixth unsuccessful attempt, defendant shot the victim, and then fled. The victim died of his wounds that evening.

26

factors (defendant's prior violent conduct and his prior convictions), and one mitigating factor (defendant's mental condition) possibly reducing his culpability for the current crimes. The officer recommended a state prison term of 50 years to life.

The trial court also had before it additional psychiatric records testimony that defendant highlights for our attention. The records demonstrate certain prison psychiatrists diagnosed defendant as suffering from psychotic disorders such as schizophrenia as far back as 1996 when defendant was 23 years old. At various times since then, he was delusional, psychotic, paranoid, and suicidal. Doctors had prescribed various medications, but defendant often refused them. A number of petitions for involuntary medication were filed, granted, and executed.

Upon reviewing all the evidence and entertaining arguments by counsel, the trial court ruled: "The Court has considered the defense request to strike the prior convictions and sentence [defendant] under the determinate sentencing scheme in this matter.

"I've considered the legal arguments regarding the precedent cited. I've considered the facts of the crimes, the circumstances particular to the defendant, including evidence presented regarding his mental illness and, additionally, the nature and extent of his criminal background.

"I do not believe in totality, based on the review of all of the circumstances, the sentence under the strikes law would constitute cruel and unusual punishment in violation of the constitution.

"Therefore, I deny the request to strike priors. Furthermore, in exercise of the Court's discretion, again, considering factors involved in this crime, which in the Court's view do involve violence.

"I understand your argument that battery may include an offensive – a mere touching. In this case, obviously the conduct of the defendant went far beyond that, additionally, the fact that there were several incidents.

"The Court has considered his mental illness context, but I do not feel that that overrides his understanding of the nature of the conduct involved and, again, the very significant and violent criminal history of this defendant.

"I, therefore, find that [defendant] does come within the spirit of the three-strikes law. There is no justification for finding him outside the spirit of the law and, in exercise of discretion, decline to exercise discretion to strike priors under that grounds [sic]."

/////

> In light of the court's reasoning upon the evidence before it, we conclude the trial court did not abuse its discretion in denying defendant's motion to strike priors. The court considered all of the relevant circumstances surrounding his present felonies, his prior serious felony convictions and adjudications, the details of his background and, in particular, the effects of his mental illness. The evidence suggests defendant continues to exhibit recidivist tendencies and engage in violent acts that would endanger public safety. The court was within the limits of its discretion in determining defendant was the type of person the Three Strikes law was designed to impact.

(Answer, Ex. A at 20-24.)

One of petitioner's arguments before this court is that the state trial court's denial of his motion to strike prior convictions was "contrary to [California] penal code section 1385." (P&A at 27.) As explained above, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle, 502 U.S. at 67. So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). Thus, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).

Petitioner has failed to show that the trial court's decision not to strike his prior convictions was fundamentally unfair. The sentencing judge understood his discretion in that regard but declined to do so after reviewing all of the pertinent information. As explained by the California Court of Appeal, the sentencing judge expounded at some length upon his reasons for declining to strike petitioner's prior convictions. The trial court's conclusion that petitioner did not fall outside the spirit of the Three Strikes Law was not unreasonable under the circumstances of this case.

Petitioner's claim that his right to substantive due process was violated by the trial court's refusal to strike his prior convictions should also be denied. The Due Process Clause of

the Fourteenth Amendment confers both procedural and substantive rights.  See Foucha v. Louisiana, 504 U.S. 71, 79-80 (1992).  "The touchstone of due process is protection of the individual against arbitrary action of government."  Meachum v. Fano, 427 U.S. 215, 226 (1976) (citing Dent v. West Virginia, 129 U.S. 114, 123 (1889)).  Official conduct which involves the willfully illegal exercise of discretion may implicate substantive due process because it affects the individual's right to be free of the abuse of power.  See Rochin v. California, 342 U.S. 165, 172 (1952) (substantive due process rights implicated where inmate is subject to conduct that "shocks the conscience").  The decision of the trial court to sentence petitioner under the Three Strikes Law was not arbitrary or an abuse of power.  After a careful review of the sentencing proceedings, the undersigned finds no federal constitutional violation in the state trial judge's exercise of sentencing discretion in this case.[7]

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised

/////

/////

_____

[7]  If petitioner's sentence had been imposed under an invalid statute and/or was in excess of that permitted under state law, a federal due process violation would be presented.  See Marzano v. Kincheloe, 915 F.2d 549, 552 (9th Cir. 1990) (due process violation found where petitioner's sentence of life imprisonment without the possibility of parole could not be constitutionally imposed under the state statute upon which his conviction was based).  However, petitioner has not made a showing that such is the case here.

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: May 1, 2009.

4

5                                 _____

6                              DALE A. DROZD
                             UNITED STATES MAGISTRATE JUDGE

7   DAD:8
  jefferson977.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26